IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| 1352 LOFTS PROPERTY CORP., | : | |
| trading as | : | CIVIL ACTION |
| 1352 LOFTS PROPERTY | : | |
| HOLDINGS, LP, | : | |
| | : | No. 10-4540 |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| BOBBY CHEZ OF PA, LLC, and | : | |
| ROBERT SLIWOWSKI | : | |
| | : | |
| Defendants. | : | |

## OPINION

**Slomsky, J.**                                              **February 29, 2012**

## I.   INTRODUCTION

This case involves a dispute between parties who had a landlord-tenant relationship in a commercially leased property located in Center City, Philadelphia.  The commercial property was leased by Plaintiff 1352 Lofts Property Corporation ("1352 Lofts") to Defendant Bobby Chez of Pennsylvania, LLC ("Bobby Chez").  The instant dispute is over two agreements:  (1) a commercial lease agreement ("the Lease" or "the Lease Agreement") entered into between 1352 Lofts and Defendant Bobby Chez; and (2) a suretyship agreement ("the Suretyship Agreement") entered into between 1352 Lofts and Defendant Robert Sliwowski ("Sliwowski"), a principal of Bobby Chez who agreed to guarantee the performance of Bobby Chez under the Lease Agreement.  Presently before the Court is a Motion for Summary Judgment filed by Plaintiff 1352 Lofts.  (Doc. No. 22.)

Plaintiff commenced this action on September 8, 2010 against Defendants Bobby Chez and Robert Sliwowski. (Doc. No. 1.) On December 23, 2010, Plaintiff filed an Amended Complaint. (Doc. No. 14.) In the Amended Complaint, Plaintiff asserts breach of contract claims against Defendant Bobby Chez (Counts I and III)[1] and Defendant Sliwowski (Counts II and IV)[2]. (Id.) The case is before the Court based on diversity of citizenship jurisdiction pursuant to 28 U.S.C. § 1332(a)(1). (Id.) Pennsylvania law applies according to the agreement of the parties. (Id., Exh. A at 26.)

On June 13, 2011, Plaintiff filed the Motion for Summary Judgment now before the Court. (Doc. No. 22.) Plaintiff contends that it is entitled to summary judgment in its favor on the breach of contract claims asserted in Counts I and III against Defendant Bobby Chez and in Counts II and IV against Defendant Sliwowski. In response, Defendants assert that the Court should deny the Motion with respect to Counts I and III because (1) Plaintiff rejected the Lease by failing to return the security deposit; (2) Plaintiff terminated the Lease by breaching the covenant of quiet enjoyment; and (3) Defendant Bobby Chez had the right to remove trade fixtures when it vacated the premises. With respect to Counts II and IV, Defendants argue that Plaintiff's Motion should be denied because the Suretyship Agreement was not in effect at the time of the alleged breaches and because Plaintiff has failed to establish any breaches at all. On

---

[1] Count I alleges that Bobby Chez breached the Lease by failing to pay rent for May, June, and July 2010. Count III alleges that Bobby Chez breached the Lease by removing trade fixtures when Bobby Chez vacated the premises in August 2010.

[2] Count II alleges that Sliwowski breached the Suretyship Agreement by failing to pay Plaintiff the amount owed by Bobby Chez for rent for May, June, and July 2010. Count IV alleges that Sliwowski breached the Suretyship Agreement by failing to pay Plaintiff for the trade fixtures removed by Bobby Chez in August 2010.

September 13, 2011, the Court held a hearing on the Motion for Summary Judgment.  (Doc. No. 32.)  The Motion has been fully briefed by the parties and is now ripe for disposition.[3]  For the following reasons, the Court will grant the Motion on Counts I and III against Defendant Bobby Chez and deny the Motion on Counts II and IV against Defendant Sliwowski.

## II.   FACTUAL BACKGROUND

Plaintiff owns 1352 Lofts, a building located on South Street in Philadelphia, Pennsylvania, and is the successor in interest on the commercial lease entered into by Bobby Chez and the Suretyship Agreement entered into by Sliwowski regarding the 1352 Lofts property.  (Doc. No. 14 ¶ 6.)  Defendant Bobby Chez is the lessee on the commercial lease.  (Id. ¶ 2.)  Defendant Sliwowski is a party to the Suretyship Agreement, in which he guaranteed the performance of Bobby Chez.  (Id. ¶¶ 3, 8.)  As noted, Plaintiff alleges that Bobby Chez breached the Lease when it failed to pay rent for May, June, and July 2010 and removed trade fixtures from the property.  (Id. ¶¶ 14, 15, 18, 20.)  Plaintiff alleges that Sliwowski is liable for these breaches under the Suretyship Agreement.  (Id. ¶¶ 30-31.)

Bobby Chez Crabcakes is a seafood restaurant chain offering take-out food options to customers primarily in the New Jersey area.  (Doc. No. 22-3 ¶¶ 6-7; Doc. No. 23-2 ¶¶ 6-7.) Bobby Chez, Inc. owns and operates Bobby Chez Crabcakes in New Jersey.  (Doc. No. 22-3 ¶ 6; Doc. No. 23-2 ¶ 6.)  Sliwowski is the sole owner of Bobby Chez, Inc.  (Doc. No. 22-3 ¶ 5; Doc.

---

[3] In deciding Plaintiff's Motion for Summary Judgment, the Court has considered the following documents:  Plaintiff's Motion for Summary Judgment (Doc. No. 22); Plaintiff's Statement of Undisputed Facts (Doc. No. 22-3); Defendants' Response in Opposition to the Motion for Summary Judgment (Doc. No. 23); Defendants' Response to Plaintiff's Statement of Undisputed Facts (Doc. No. 23-2); Defendants' Statement of Undisputed Facts (Doc. No. 23-3); Plaintiff's Reply Brief in Further Support of Plaintiff's Motion for Summary Judgment (Doc. No. 24); and the arguments of the parties at the September 13, 2011 hearing.

No. 23-2 ¶ 5.)  Defendant Sliwowski is also an owner and manager of Defendant Bobby Chez of

PA, LLC, which was formed to own and operate a Bobby Chez Crabcakes restaurant in

Pennsylvania.  (Doc. No. 22-3 ¶¶ 4, 8; Doc. No. 23-2 ¶¶ 4, 8.)

     In late 2006, Rimas Properties LP ("Rimas") was developing a building known as "1352

Lofts" located at 1326-1352 South Street, Philadelphia, Pennsylvania.  (Doc. No. 22-3 ¶ 12; Doc.

No. 23-2 ¶ 12.)  A representative from Rimas approached Sliwowski to determine whether he

would lease one of six commercial condominiums located in 1352 Lofts for the purpose of

operating a Bobby Chez Crabcakes restaurant.  (Doc. No. 22-3 ¶¶ 11, 15; Doc. No. 23-2 ¶¶ 11,

15.)  Beginning in October 2006 and continuing for approximately six months thereafter, Rimas

and Sliwowski negotiated the commercial lease agreement at issue here.  (Doc. No. 22-3 ¶¶ 16-

17; Doc. No. 23-2 ¶¶ 16-17.)

     On April 23, 2007, Rimas and Bobby Chez entered into the Lease.  (Doc. No. 22-4, Ex.

F; see also Doc. No. 22-3 ¶ 21; Doc. No. 23-2 ¶ 21.)  Sliwowski signed the Lease on behalf of

Bobby Chez and did so only after his counsel read and reviewed it.  (Doc. No. 22-3 ¶ 21; Doc.

No. 23-2 ¶ 21.)  The Lease provides that "[o]n or before the first day of each and every

successive calendar month during the Term, Tenant [Bobby Chez] agrees to pay the Landlord the

Minimum Rent."  (Doc. No. 22-4, Ex. F ¶ 4.1.)  Minimum Rent (also "Base Rent") was $51,000

for the first three years, $56,100 for years four to seven, and $59,500 for the last three years of

the Lease.  (Id. ¶ 1.1(g).)  In addition to Minimum Rent, Bobby Chez was responsible to pay

additional rent, which consisted of its share of condominium fees and operating expenses.  (Id. ¶

4.2.)  The Lease contains a paragraph regarding a "Free Rent Period."  It provides:

        Tenant's obligation to pay Minimum Rent shall be abated as to the entire

4

Premises during the earlier of (i) the first five (5) months of the Term, commencing as of the Commencement Date or (ii) the date Tenant opens for business.  (The "Free Rent Period").  Such abatement shall apply to the Minimum Rent payable under this Lease during the Free Rent Period; provided however, Tenant shall pay the cost of utility usage occurring during the Free Rent Period as well as Condominium Fees, Taxes (as hereinafter defined) and Use and Occupancy Taxes.  Minimum Rent for any calendar month in which the Free Rent Period expires shall be prorated based upon a thirty (30) day month, and all such Minimum Rent shall be due and payable for the actual days that elapse during the remainder of the month in which the Free Rent Period expires.  The abatement of Minimum Rent described above is expressly conditioned on Tenant's performance of all of its obligations and responsibilities under this Lease throughout the Term of this Lease, and the amount of the abated Minimum Rent is based in part on the amount of Minimum Rent due under this Lease for the Term.  If Tenant breaches this Lease and such default results in the termination of this Lease, the Tenant shall pay to the Landlord on the date of such termination, in addition to all other amounts and damages to which Landlord is entitled, the amount of Minimum Rent which would otherwise have been due and payable during the Free Rent Period (based on the monthly Minimum Rent due during the month immediately following the Free Rent Period).

(Doc. No. 22-4, Ex. F ¶ 4.3.)

With respect to the Term of the Lease Agreement, it provides:

3.1    Term.  The duration of this Lease shall be the Term.  The Term will commence on the Commencement Date and expire on the Termination Date, unless earlier terminated as provided herein.

(Id. ¶ 3.1.)  Section 1 of the Lease contains a definition of terms.  It provides as follows:

In addition to the terms which are defined elsewhere in this Lease, the following defined terms are used in this Lease:

* * *

(e)    TERM:   Ten Years, beginning on the expiration of the Free Rent Period . . . and expiring on the Termination Date.  The Commencement Date shall be the date of the execution of this Lease by both Landlord and Tenant.

* * *

5

>   (f)     TERMINATION DATE:    (i) if the Rent Commencement
>   Date is the first day of a calendar month, the 120-month anniversary
>   of the day immediately preceding the Rent Commencement Date; or
>   (ii) if the Rent Commencement Date is not the first day of a month,
>   the 120-month anniversary of the last day of the month in which the
>   Commencement Date occurs.

The Lease Agreement was executed on April 23, 2007.  (Doc. No. 22-4, Ex. F ¶ 1.1(a).)

It contains an integration clause which provides, "This Lease contains all of the agreements of

the parties hereto with respect to any matter covered or mentioned in this Lease, and no prior or

contemporaneous agreements or understanding pertaining to any such matters shall be effective

for any purpose."  (<u>Id.</u> ¶ 31.10.)

On April 23, 2007, the same day Rimas and Bobby Chez entered into the Lease, Rimas

and Sliwowski entered into the "Suretyship Agreement."  (Doc. No. 22-4, Ex. G; <u>see also</u> Doc.

No. 22-3 ¶ 22; Doc. No. 23-2 ¶ 22.)  The Suretyship Agreement provides:

>   In consideration of the execution [of the Lease] . . . the undersigned,
>   [Defendant] Robert Sliwoski [sic] (hereinafter referred to as "Surety")
>   intending to be legally bound hereby, becomes surety for the prompt and
>   faithful performance by Tenant of the within Lease and all of the terms,
>   covenants and conditions thereof, including, but not limited to, the payment
>   by Tenant of the rental and all other sums to become due thereunder, the
>   timely opening, occupancy and continued operation of the Permitted Use (as
>   defined in the Lease), and the obligation to repay to Landlord the tenant
>   improvement allowance provided by Landlord in the amount of $71,800.00
>   in the event Tenant fails to perform.

(Doc. No. 22-4, Ex. G at 1.)  The Suretyship Agreement also contains an integration clause

which provides, "This Agreement shall be considered to be the only Agreement between the

parties pertaining to the Lease."  (<u>Id.</u> at 2.)  The Agreement was to be "effective only during the

first three years of the lease term."  (<u>Id.</u>)

On March 27, 2007, prior to the execution of the Lease and Suretyship Agreement, Rimas

6

and Sliwowski executed an "Addendum to Letter of Intent" (the "Addendum").  (Doc. No. 23-3,

Ex. C at 1.)  The Addendum provides that Sliwowski "personally guarantees that a Bobby Chez

gourmet seafood restaurant will open and occupy the premises and, in the event that the

restaurant fails to conduct regular business, Robert Sliwowski shall be personally liable for the

repayment of the $71,800.00."  (Id.)  The Addendum is typed, but it contains several hand-

written edits, initialed by Sliwowski.  (Id.)  According to Defendants, this Addendum evidences

the intent of Rimas and Sliwowski that Sliwowski would only guarantee Bobby Chez's

performance in opening a restaurant and that he would only be liable for the repayment of

$71,800.  (Defendants' Statement of Undisputed Facts, Doc. No. 23-2 ¶¶ 3-7.)

On June 11, 2007, the premises were available for occupancy.  (Doc. No. 22-3 ¶ 24; Doc.

No. 23-2 ¶ 24.)  Four weeks later, Defendants opened a Bobby Chez Crabcakes restaurant at

1352 Lofts.[4]  (Doc. No. 22-3 ¶ 25; Doc. No. 23-2 ¶ 25.)  On March 24, 2009, Rimas and Bobby

Chez executed an amendment to the Lease (the "Amendment").  (Doc. No. 22-4, Ex. H; see also

Doc. No. 22-3 ¶ 27; Doc. No. 23-2 ¶ 28.)  The Amendment provides:

1.   Base Rent will be reduced by $1,500.00 for a period of eight (8)
     months (April 2009 through and including November 2009), bringing
     base rent to $2,750.00 per month.

2.   At the conclusion of the aforementioned eight months, Base Rent will
     be increased by $333.33 for a period of twelve (12) months
     (December 2009 through and including November 2010) bring [sic]
     Base Rent will to [sic] $4,583.22 per month.

(Doc. No. 22-4, Ex. H.)

From November 2007 through April 2010, Bobby Chez made rent payments without

_____

[4]  At the September 13, 2011 hearing, the parties agreed that Bobby Chez Crabcakes
opened for business on July 10, 2007.

incident.[5]  (Doc. No. 22-3 ¶ 29; Doc. No. 23-2 ¶ 29.)  Due to the economic downturn, however,

Rimas ran into financial difficulty in completing development of the property.  (Doc. No. 22-3 ¶

30; Doc. No. 23-2 ¶ 30.)  This financial setback caused Rimas to default on a construction loan

with Amalgamated Bank ("Amalgamated").  The loan was secured by a mortgage on 1352 Lofts.

(Doc. No. 22-3 ¶¶ 14, 31; Doc. No. 23-2 ¶ 31.)  On June 10, 2009, Amalgamated filed a

confession of judgment against Rimas in the Court of Common Pleas of Philadelphia County,

Pennsylvania.  (Doc. No. 22-3 ¶ 32; Doc. No. 23-2 ¶ 32.)  A judgment was obtained and

executed against condominium units owned by Rimas, including 1352 Lofts.  (Doc. No. 22-3 ¶

33; Doc. No. 23-2 ¶ 33.)  Amalgamated then obtained a writ of execution to sell at a sheriff's sale

the units covered by the judgment.  (Doc. No. 22-3 ¶ 33; Doc. No. 23-2 ¶ 33.)  In October 2009,

Amalgamated posted hand bills on the 1352 Lofts property to provide notice of the impending

sheriff's sale.  (Doc. No. 22-3 ¶ 35.)  The sale was originally scheduled for November 3, 2009,

but was postponed until December 1, 2009.  (Id. ¶¶ 34, 36.)  The parties dispute whether new

hand bills were posted mentioning the continuance.  While Plaintiff contends that no new hand

bills were posted (id. ¶ 36), Defendants assert that hand bills were re-posted by the sheriff's

office after they were removed by employees of Bobby Chez (Doc. No. 23-2 ¶ 36).

On December 1, 2009, a sheriff's sale was held and Amalgamated, the judgment creditor,

successfully bid on 1352 Lofts.  (Doc. No. 22-3 ¶ 38; Doc. No. 23-2 ¶ 38.)  Amalgamated

assigned its right to receive the deed to 1352 Lofts to Plaintiffs.  (Doc. No. 22-3 ¶ 38; Doc. No.

---

[5]  As noted above, "Base Rent" in the Amendment is the same as "Minimum Rent" in the
Lease Agreement.  For the first three years of the Lease, the Minimum Rent owed each year was
$51,000.00.  The Lease specifies that rent was to be paid in monthly installments.  (Doc. No. 22-
4, Ex. F ¶ 4.1.)  The minimum amount due each month for the first three years of the Lease was
$4,250.00.

23-2 ¶ 38.)  By deed dated March 8, 2010, Plaintiff became the owner of 1352 Lofts.  (Doc. No.

22-3 ¶ 39; Doc. No. 23-2 ¶ 39.)  On April 21, 2010, the deed was recorded and Plaintiff

succeeded to the rights of Rimas under the Lease and Suretyship Agreement.  (Doc. No. 22-3 ¶

39; Doc. No. 23-2 ¶ 39.)

Under a provision in the Lease, the terms of the Lease were not affected by the transfer of

Rimas' interest in the property to Plaintiff.  (Doc. No. 22-3 ¶ 41; Doc. No. 23-2 ¶ 41.)  Section

30.5 of the Lease provides:

> **Attornment**.  If the interest of Landlord is transferred to any person (a
> "Transferee") by reason of the termination, foreclosure, or proceedings for
> enforcement, of an Encumbrance, or by delivery of a deed-in-lieu of such
> foreclosure or proceedings, Tenant will immediately and automatically attorn
> to the Transferee.  Upon attornment this Lease will continue in full force and
> effect as a direct lease between Transferee and Tenant, upon all of the same
> terms, conditions and covenants as stated in the Lease.

(Doc. No. 22-4, Ex. F ¶ 30.5.)

By letter dated May 4, 2010, a Joseph LoMonaco acting on behalf of Plaintiff notified

Bobby Chez that it had succeeded to the interest of Rimas under the Lease and that all rent

should be paid to Plaintiff.  (Doc. No. 22-3 ¶¶ 43-44; Doc. No. 23-2 ¶¶ 43-44; see also Doc. No.

22-4, Ex. K.)  Despite receiving this notice, Bobby Chez did not make rent payments for May or

June 2010.  (Doc. No. 22-3 ¶ 45; Doc. No. 23-2 ¶ 45.)  The payments were withheld because

Sliwowski believed he was entitled to do so pending the return of a security deposit of $12,750.

(Doc. No. 23-2 ¶¶ 10-19, 45.)  Following the foreclosure of 1352 Lofts, Sliwowski attempted to

locate where the deposit was being held.  (Doc. No. 23-2 ¶ 45.)

Paragraph 7 of the Lease applies to the return of the security deposit.  It provides in

relevant part:

9

> If Tenant shall fully and faithfully perform every provision of this Lease to be performed by it, the Security Deposit of any balance thereof shall be returned to Tenant . . . within 60 days following the expiration of the Term.

(Doc. No. 22-4, Ex. F ¶ 7.)  By letter dated June 14, 2010, LoMonaco notified Bobby Chez of its failure to make rent payments for May or June 2010.  (Doc. No. 23-2 ¶ 46; Doc. No. 22-3 ¶ 46; see also Doc. No. 22-4, Ex. L.)  Bobby Chez did not make a July 2010 rent payment for the same reason it withheld rent for May and June.  (Doc. No. 22-1 at 5-6.)

On July 30, 2010, a David Overstreet, on behalf of Plaintiff, terminated the Lease effective July 31, 2010, demanding that Defendant Bobby Chez vacate 1352 Lofts by August 16, 2010.  (Doc. No. 22-3 ¶ 48; Doc. No. 23-2 ¶ 48; see also Doc. No. 22-3, Ex. M.)  Overstreet notified Defendants that Plaintiff elected to accelerate damages and recover the full amount of the lost benefit in accordance with section 25.2 of the Lease, which provides that "[a]ll past due amounts shall be immediately due and payable to Landlord."  (Doc. No. 22-4, Ex. F ¶ 25.2; see also Doc. No. 22-3 ¶ 49; Doc. No. 23-2 ¶ 49.)

When Bobby Chez vacated 1352 Lofts in mid-August 2010, it removed property, equipment, alterations, and fixtures including stoves, appliances, trade fixtures, furniture, cabinetry, exterior signage, and possibly a hot water heater.[6]  (Doc. No. 22-3 ¶¶ 50-51; Doc. No. 23-2 ¶ 51.)[7]  Plaintiff asserts that Bobby Chez failed to repair the damage done to the Property

---

[6]  The parties dispute whether Bobby Chez removed the hot water heater from the premises.  Plaintiff claims it was removed by Defendants.  (Doc. No. 22-3 ¶ 51.)  Sliwowski testified that he did not know if the water heater was removed.  (See Deposition of Defendant Sliwowski ("Sliwowski Depo."), Doc. No. 22-4, Ex. A, at 124:2-5.)

[7]  Paragraph 50 is missing from Defendants' Response to the Statement of Undisputed Facts of Plaintiff (Doc. No. 23-2).  The corresponding paragraph in Plaintiff's Statement of Undisputed Facts is that:  "Bobby Chez LLC vacated the Premises in the middle of August 2010."  This fact is consistent with the testimony given by Sliwowski at his deposition.

when the fixtures were removed.  (Doc. No. 22-3 ¶ 52.)  Sliwowski has refused to cover the

financial obligations of Bobby Chez under the Lease, maintaining that there are no applicable

suretyship terms obligating him to do so.  (Doc. No. 22-3 ¶ 53; Doc. No. 23-2 ¶ 53.)

## III.    LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a) (revised 2011).  A disputed issue is "genuine" only if there is a sufficient evidentiary basis

on which a reasonable jury could find for the non-moving party.  Kaucher v. County of Bucks,

455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

(1986)).  A factual dispute is "material" only if it might affect the outcome of the suit under

governing law.  Doe v. Luzerne County, 660 F.3d 169, 175 (3d Cir. 2011) (citing Gray v. York

Papers, Inc., 957 F.2d 1070, 1078 (3d. Cir. 1992)).  The Court's task is not to resolve disputed

issues of fact, but to determine whether there exist any factual issues to be tried.  Anderson, 477

U.S. at 247-49.

In deciding a motion for summary judgment, the Court must view the evidence, making

all reasonable inferences from the evidence in the light most favorable to the non-moving party.

Bouriez v. Carnegie Mellon Univ., 585 F.3d 765, 770 (3d Cir. 2009).  Whenever a factual issue

arises which cannot be resolved without a credibility determination, at this stage the Court must

credit the non-moving party's evidence over that presented by the moving party.  Anderson, 477

U.S. at 255.   If there is no factual issue and if only one reasonable conclusion could arise from

---

(Sliwowski Depo. at 113:18-21.)  Therefore, the Court made the finding of fact that Bobby Chez
vacated the premises in mid-August.

the record regarding the potential outcome under the governing law, summary judgment must be awarded in favor of the moving party.  Id. at 250.

IV.    **DISCUSSION**

Plaintiff seeks summary judgment in its favor on the breach of contract claims asserted against both Defendants in the Amended Complaint.  Plaintiff claims that it is entitled to summary judgment on Counts I and III against Defendant Bobby Chez and Counts II and IV against Defendant Sliwowski.  Moreover, Plaintiff claims that the defenses raised by Defendants do not preclude a finding of summary judgment in favor of Plaintiff.  In response, Defendants argue that Plaintiff is not entitled to summary judgment.  For reasons set forth below, the Court will grant Plaintiff's Motion on Counts I and III against Bobby Chez and will deny Plaintiff's Motion on Counts II and IV against Sliwowski.

In order to establish a breach of contract claim under Pennsylvania law, a plaintiff must prove the following:  "(1) the existence of a contract, including its essential terms, (2) a breach of duty imposed by the contract, and (3) resultant damages."  Axis Speciality Ins. Co. v. Brickman Group Ltd., LLC, Nos. 10-4688, 10-4771, 2012 WL 172836, at *2 (3d Cir. January 23, 2012) (quoting Ware v. Rodale Press, Inc., 322 F.3d 218, 225 (3d Cir. 2003) (internal quotations omitted)).  Here, Plaintiff has proven the existence of a contract between Plaintiff and Defendant Bobby Chez (the Lease), and between Plaintiff and Defendant Sliwowski (the Suretyship Agreement).  (Doc. No. 22-4, Exs. F and G.)  A discussion follows on the remaining elements needed to establish a breach of contract claim in accordance with the four claims of Plaintiff.

A.     **Counts I and III Against Bobby Chez**

In the Amended Complaint, Plaintiff alleges as follows:  Bobby Chez was required to pay

12

rent and failed to do so (Count I); Bobby Chez removed trade fixtures without Plaintiff's express consent (Count III); and that these actions constitute a breach of the Lease.  The uncontested facts establish that the Lease required Bobby Chez to make monthly rent payments and leave the premises "in good order and repair."  The uncontested facts also establish that Bobby Chez breached the Lease by failing to pay rent for May, June, and July 2010, and by removing trade fixtures after the Lease was terminated in August 2010.  Defendants make several arguments to justify the breaches, but each argument is unavailing as a matter of law.  Accordingly, the Court will grant summary judgment in favor of Plaintiff on the breach of contract claims contained in Counts I and III of the Amended Complaint.

Defendants argue that they should not be held liable for breaching the Lease because Plaintiff either rejected or breached the Lease by failing to return the security deposit.  This argument is unpersuasive.  There is no evidence that Plaintiff rejected or breached the Lease.  After the transfer of interest from Rimas to 1352 Lofts, Plaintiff notified Defendants of the change in ownership and directed that all future rent payments be made to Plaintiff.  Under the "attornment" provision in paragraph 30.5, the Lease continued in full force and effect following a transfer by foreclosure.  Defendant Bobby Chez continued to occupy 1352 Lofts after the transfer of ownership.  Most importantly, the obligation imposed by paragraph 7 regarding the security deposit required that the deposit be returned within 60 days of the expiration of the Lease Term and only if Bobby Chez fulfilled all of its obligations under the Lease Agreement.  At the very least, Bobby Chez did not fulfill the requirement of paying rent on a timely basis from May to July 2010.  Therefore, Plaintiff had no obligation to return the security deposit following the foreclosure.

Defendants also argue that Plaintiff terminated the Lease by breaching the covenant of quiet enjoyment. In Pennsylvania, every lease contains an implied covenant of quiet enjoyment. Kohl v. PNC Bank Nat'l Ass'n, 912 A.2d 237, 248 (Pa. 2006). Here, there is an express covenant of quiet enjoyment contained in paragraph 31.8 of the Lease. This paragraph provides:

> Upon Tenant paying the Rent reserved hereunder and observing and performing all of the covenants, conditions and provisions on Tenant's part to be observed and performed hereunder, Tenant shall peaceably and quietly hold and enjoy the Premise for the entire Term hereof, without hindrance or interruption by Landlord or any other person claiming by, through, or under Landlord, subject to all the provisions of this Lease and any mortgage to which this Lease is subordinate.

(Doc. No. 22-4, Ex. F ¶ 31.8.) Pennsylvania law has long recognized that a wrongful act by the lessor that interferes with the lessee's possession, in whole or in part, breaches the covenant of quiet enjoyment and results in a termination of the lease agreement. Kohl, 912 A.2d at 248-49 (citing Kelly v. Miller, 94 A. 1055, 1056 (1915)). According to Defendants, Plaintiff breached this covenant when notices of the sheriff's sale were posted in the windows of the Property because the notices "had a substantial detrimental effect" on Bobby Chez's business. However, the Court is unpersuaded that the covenant of quiet enjoyment, whether express or implied, was breached, even when reviewing the facts alleged in the light most favorable to Bobby Chez.

As part of the mortgage foreclosure proceedings, Rimas was required to post notice of the sheriff's sale. Under the express terms of the quiet enjoyment covenant in paragraph 31.8 of the Lease, this posting was permissible because the covenant terms acknowledge that the Lease is subordinate to the mortgage. Further, Defendants have not alleged any facts to support the claim that the notices had a "substantial detrimental effect" on their possession of the Property, as they

14

allege in their brief in opposition to Plaintiff's Motion.  Even if notices were posted on the premises, customers of Defendant Bobby Chez could enter and leave the premises at their pleasure, employees of Bobby Chez could continue to do their job, and the business could continue to operate without interruption.

Plaintiff is also entitled to summary judgment on Count III.  The breach alleged in Count III pertains to the removal of trade fixtures.  The Lease provides:

> If Tenant is not in default, Tenant may remove from the Premises any trade fixtures, equipment and movable furniture placed in the Premises by the Tenant, whether or not such trade fixtures or equipment are fastened to the Building; provided, however, that Tenant will not remove any trade fixtures or equipment without the Landlord's prior written consent if such fixtures or equipment are used in the operation of the Building, or if the removal of such fixtures or equipment will result in impairing the structural strength of the Building. . . . Tenant will repair any damage occasioned by the removal of any trade fixtures, equipment, furniture or Alterations.

(Doc. No. 22-4, Ex. F ¶ 15.)  Under the Lease, Bobby Chez could remove trade fixtures and other equipment only if it was not in default and even then, only with the express consent of Plaintiff if the fixtures or equipment were used in the operation of the building.  Here, Bobby Chez was in default in the payment of rent for May, June, and July 2010 and admits to removing property, equipment, alterations, and fixtures including, stoves, appliances, trade fixtures, furniture, cabinetry, exterior signage, and possibly a hot water heater.[8]  (Doc. No. 22-3 ¶¶ 50-51; Doc. No.

---

[8]  As noted above, the parties dispute whether Bobby Chez removed the hot water heater from the premises.  Plaintiff submits it was removed by Defendants.  (Doc. No. 22-3 ¶ 51.) Defendant Sliwowski testified he did not know if the water heater was removed.  (See Sliwowski Depo. at 124:2-5.)  Since the hot water heater is not the only fixture/equipment Bobby Chez is alleged to have removed from 1352 Lofts, Plaintiff's failure to establish that Bobby Chez removed this fixture does not preclude granting summary judgment on the breach of contract claim contained in Count III.

23-2 ¶ 51.) Thus, removal of these fixtures was a breach of paragraph 15 of the Lease because Bobby Chez was in default in the payment of rent.  Defendants contend that the July 30, 2010 letter terminating the Lease and demanding that Defendant Bobby Chez vacate the premises should be interpreted as written consent to the removal of fixtures.  The Court disagrees.  The letter does not in any way limit the relief that may be sought under the Lease Agreement. Consequently, Plaintiff is entitled to summary judgment in its favor on Count III, as well as on Count I.

### B.       Counts II and IV Against Sliwowski

In the Amended Complaint, Plaintiff alleges that pursuant to the Suretyship Agreement, Sliwowski is liable for any breaches by Bobby Chez of the terms of the Lease.  Under this Agreement, Sliwowski agreed to guarantee the performance of the Lease by Bobby Chez. Therefore, according to Plaintiff, Sliwowski is responsible for, and required to satisfy, any payment that Bobby Chez failed to make to the landlord, and for any damages arising from the removal of trade fixtures.  In response, Defendants assert that any obligation of Sliwowski under the Suretyship Agreement was not in effect at the time breaches were allegedly made by Bobby Chez.  Because the parties disagree as to when the Suretyship Agreement became effective, a genuine issue of material fact exists that precludes granting Plaintiff's Motion for Summary Judgment on Counts II and IV.  For reasons that follow, the Court will deny Plaintiff's Motion with respect to these Counts against Defendant Sliwowski.

The parties agree that the Suretyship Agreement was effective "during the first three years of the lease term." (Doc. No. 22-4, Ex. G at 2.)  Although the Lease was executed on April 23, 2007, the parties disagree on when the Lease Term began.  According to Plaintiff, the Lease

Term did not begin until the Free Rent Period expired.  Plaintiff submits that the Free Rent

Period expired on November 10, 2007.[9]  According to Defendants, the Lease Term began on the

Commencement Date, April 23, 2007.  As discussed below, the provisions in the Lease that refer

to and attempt to define the Lease Term present multiple ways in which to calculate the Lease

Term, making it uncertain when the Lease Term began and creating a question of fact which

precludes awarding summary judgment to Plaintiff.

Under Pennsylvania law, the interpretation of a contract is a question of law that requires

the court to determine the intent of the parties through the written agreement.  In re Old Summit

Manufacturing, LLC, 523 F.3d 134, 137 (3d Cir. 2008) (citing Dep't of Trans. v. Pa. Indus. for

the Blind & Handicapped, 886 A.2d 706, 711 (Pa. Cmmw. Ct. 2005)).  The court should assume

that the contractual language was carefully chosen by the parties and that the parties were

mindful of the meaning of the words used when drafting the agreement.  Id. (citing same).

Where the parties dispute the interpretation of a contract, such as in the case at hand,

summary judgment is appropriate only if the term in dispute is unambiguous.  Galbreath

Riverbank, L.P. v. Owens & Dowling, No. 93-4166, 1994 WL 269667, at *4 (E.D. Pa. June 20,

---

[9]  As discussed below, Defendants do not disagree that the Free Rent Period expired
November 10, 2007.  However, as a preliminary matter, the provision in the Lease regarding the
Free Rent Period can be interpreted in ways not presented by the parties.  The Lease provides that
the "obligation to pay Minimum Rent shall be abated . . . during the earlier of (i) the first five (5)
months of the Term, commencing as of the Commencement Date or (ii) the date Tenant opens
for business.  (The "Free Rent Period")."  (Doc No. 22-4, Ex. F ¶ 4.3.)  If the Commencement
Date is April 23, 2007 when the Lease was executed, and if Bobby Chez opened for business on
July 10, 2007, then the Free Rent Period would begin on the earlier date of April 23, 2007 and
expire five months later on September 23, 2007.  The only other date referred to in the Free Rent
Period provision is the date that Bobby Chez opened for business.  According to the parties,
Bobby Chez opened for business on July 10, 2007.  If the Free Rent Period began on July 10,
2007, then it would have expired on December 10, 2007.

1994) (citing PaineWebber, Inc. v. Hofmann, 984 F.2d 1372, 1378 (3d Cir. 1993)).  When an

ambiguity exists, then the trier of fact must determine the meaning of the terms of the contract

through the plain language of the agreement and extrinsic evidence.  Id. (citing Mellon Bank,

N.A. v. Aetna Business Credit, Inc., 619 F.2d 1001, 1011, n.10 (3d Cir. 1980)).  "Ambiguity has

been defined as 'intellectual uncertainty; . . . the condition of admitting two or more meanings, of

being understood in more than one way, or referring to two or more things at the same time.'"

Id. (quoting Mellon Bank, N.A., 619 F.2d at 1011).

      Here, Plaintiff and Defendants disagree about when the Lease Term began.  As discussed

below, since an ambiguity exists in the Lease Agreement regarding the start date of the Lease

Term, summary judgment is not appropriate on Counts II and IV.

      The Lease provides:

> 3.1    Term.  The duration of this Lease shall be the Term.  The Term will
> commence on the Commencement Date and expire on the Termination Date,
> unless earlier terminated as provided herein. . . .

(Doc. No. 22-4, Ex. F ¶ 3.1.)  Section 1 of the Lease contains a definition of terms.  It provides as

follows:

> In addition to the terms which are defined elsewhere in this Lease, the
> following defined terms are used in this Lease:
>
>   * * *
>
> (e)    TERM: Ten Years, beginning on the expiration of the Free
> Rent Period . . . and expiring on the Termination Date.  The
> Commencement Date shall be the date of the execution of this Lease
> by both Landlord and Tenant.

When the above sections are read together, the Lease appears to provide that the Term began on

the Commencement Date, April 23, 2007 (see id. ¶ 3.1), or at the expiration of the Free Rent

Period (see id. ¶ 1.1(e)).  The Free Rent Period is defined in the Lease as follows:

> Tenant's obligation to pay Minimum Rent shall be abated . . . during the earlier of (i) the first five (5) months of the Term, commencing as of the Commencement Date or (ii) the date Tenant opens for business.

(Doc. No. 22-4, Ex. F ¶ 4.3.)

Plaintiff claims, and Defendants do not dispute, that the Free Rent Period began when the premises were available for occupancy by Bobby Chez on June 11, 2007.  (Doc. No. 24 at 4.).  If the Free Rent Period began on June 11, 2007, then the Free Rent Period expired five months later, on November 10, 2007.  Plaintiff argues that the Lease Term began on November 10, 2007, when the Free Rent Period expired.  (Doc. No. 22-1 at 15.)  According to Plaintiff, the Suretyship Agreement began on November 10, 2007, and expired three years later on November 10, 2010. Therefore, Defendant Sliwowski would be obligated to compensate Plaintiff for any breaches that occurred through November 10, 2010.  (Doc. No. 22-1 at 15.)  Because Bobby Chez failed to pay rent for May, June, and July 2010, and because Bobby Chez removed trade fixtures in August 2010, under Plaintiff's interpretation of the Lease, Sliwowski is liable for any damages that arose from Bobby Chez's alleged breaches.

Defendants contend that the Lease Term began on the Commencement Date, April 23, 2007.  (Doc. No. 23 at 3-4.)  If Defendants' interpretation is correct, then the Suretyship Agreement expired three years after the Commencement Date, or April 23, 2010.  Since Bobby Chez failed to make rent payments for May, June, and July of 2010, under Defendants' interpretation of the Lease, the Suretyship Agreement was not in effect when Bobby Chez withheld rent for May to July 2010, and when Bobby Chez removed trade fixtures in August 2010.

The factual dichotomy advanced by Plaintiff and Defendants demonstrates that the Lease Term can be viewed in multiple ways with conflicting start dates.  Because the definition of the start date is crucial to determining if the Suretyship Agreement was in effect when Bobby Chez breached the Lease, and because when the Lease Term began is unclear, the Court cannot grant summary judgment in Plaintiff's favor on Counts II and IV.  The factual dispute between the parties is palpable and must be resolved by the trier of fact.

**V.     CONCLUSION**

For reasons above, the Court will grant summary judgment in favor of Plaintiff on Counts I and III against Defendant Bobby Chez.  As to Counts II and IV, the Court will deny Plaintiff's Motion because an ambiguity exists regarding whether the Suretyship Agreement was in effect at the time of the alleged breaches.

An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| 1352 LOFTS PROPERTY CORP., | : | |
| trading as | : | CIVIL ACTION |
| 1352 LOFTS PROPERTY | : | |
| HOLDINGS, LP, | : | |
| | : | No. 10-4540 |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| BOBBY CHEZ OF PA, LLC, and | : | |
| ROBERT SLIWOWSKI | : | |
| | : | |
| Defendants. | : | |

## ORDER

**AND NOW**, this 29th day of February 2012, upon consideration of Plaintiff's Motion for

Summary Judgment and Statement of Undisputed Facts (Doc. Nos. 22 and 22-3), Defendants'

Response in Opposition to the Motion for Summary Judgment, Response to Plaintiff's Statement

of Undisputed Facts and Statement of Undisputed Facts (Doc. Nos. 23, 23-2, 23-3), Plaintiff's

Reply Brief in Further Support of Plaintiff's Motion for Summary Judgment (Doc. No. 24), and

the arguments of the parties at the September 13, 2011 hearing, and for the reasons stated in the

Opinion filed this day, it is **ORDERED** as follows:

1.  Plaintiff's Motion for Summary Judgment (Doc. No. 22) is **GRANTED** on Counts I

and III.

2.  Plaintiff's Motion for Summary Judgment (Doc. No. 22) is **DENIED** on Counts II

and IV.

BY THE COURT:

 /s/ Joel H. Slomsky, J.
JOEL H. SLOMSKY, J.